IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No. 12-cv-01255-WYD-KMT

CLAIRE BRAINERD,

    Plaintiff,

v.

SCHLUMBERGER TECHNOLOGY CORP.,

    Defendant.

_____

**ORDER**
_____

THIS MATTER is before the Court on defendant, Schlumberger Technology Corp.'s, Motion For Summary Judgment [ECF No. 32]. For the reasons stated below, the motion is GRANTED and Brainerd's Title VII sex discrimination claim is DISMISSED WITH PREJUDICE.

**BACKGROUND**

On May 14, 2012, plaintiff, Claire Brainerd, filed this suit against defendant, Schlumberger Technology Corp. ("Schlumberger"), alleging that Schlumberger discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, by terminating her because she is a female.

Schlumberger "is one of the world's leading oil field service companies" and "operates a drilling and measurements facility in Commerce City, Colorado." ECF No. 32, p. 2, ¶ 1. On May 16, 2011, Schlumberger hired Brainerd as a Mechanic Technician Trainee for the Drilling and Measurements Segment at its Commerce City facility. On

September 13, 2011, Schlumberger terminated Brainerd because of her alleged poor performance, safety record, and sub-par attitude.  Brainerd alleges that Schlumberger failed to provide any rational reason for her termination and maintains that Schlumberger terminated her because it did not want a female working in her particular position.

Brainerd file a sexual discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") and on February 29, 2012, she received an EEOC right to sue letter.  Brainerd subsequently filed this suit on May 14, 2012, alleging a Title VII sex discrimination claim against Schlumberger.  On April 25, 2013, Schlumberger filed a Motion For Summary Judgment [ECF No. 32] arguing that it is entitled to judgment as a matter of law on Brainerd's sex discrimination claim because:  (1) Brainerd cannot establish that she was satisfactorily performing her job at the time of her termination; (2) Brainerd cannot establish that she was terminated under circumstances giving rise to an inference of discrimination; (3) Brainerd was terminated for a legitimate, non-discriminatory reason; and, (4) Brained cannot establish that Schlumberger's legitimate, non-discriminatory reason for her termination is a pretext for discrimination under Title VII.

## ANALYSIS

**A.  Legal Standard for a Motion for Summary Judgment**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Equal Employment Opportunity Comm. v. Horizon/CMS Healthcare Corp.*, 220

F.3d 1184, 1190 (10th Cir. 2000). "When applying this standard, [the court must] 'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (citation omitted). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Horizon/CMS Healthcare*, 220 F.3d at 1190. "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

"The burden of showing that no genuine issue of material fact exists is borne by the moving party." *Horizon/CMS Healthcare*, 220 F.3d at 1190. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Atl. Richfield Co.*, 226 F.3d at 1148 (quotation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Sw. Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

**B. Brainerd's Title VII Claim**

Brainerd alleges that Schlumberger discriminated against her on the basis of her sex, in violation of Title VII.

Title VII makes it unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff who seeks to prove that an employer discriminated against him or her can use direct or circumstantial evidence." *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000) (quoting *Ingels v. Thiokol*

*Corp.*, 42 F.3d 616, 620 (10th Cir. 1994)). "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting *Hall v. United States DOL*, 476 F.3d 847, 855 (10th Cir. 2007)). In other words, "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002) (citation omitted). Circumstantial evidence is evidence that "allows the jury to draw a reasonable inference that discrimination occurred." *Id.*

Brainerd does not present any direct evidence of discrimination. Therefore, her claims are analyzed under the burden shifting framework announced by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this evidentiary framework, the plaintiff must first establish a *prima facie* case of discrimination. *Sanders v. Southwestern Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (citing *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998)). If the plaintiff does so, the burden then shifts to the defendant "to give a legitimate, nondiscriminatory reason for its employment decision." *Id.* (citation omitted). "If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). "A plaintiff who demonstrates pretext gets over the hurdle of summary judgment." *Id.* (internal quotation marks and citation omitted).

### 1. Brainerd's *Prima Facie* Case

In order to establish a *prima facie* case of sex discrimination under Title VII, Brainerd must establish that: (1) she is a member of a protected class; (2) she was qualified for and satisfactorily performing her job; and, (3) she was terminated under circumstances giving rise to an inference of discrimination. *Barlow v. C.R. Eng., Inc.*, 703 F.3d 497, 505 (10th Cir. 2012).[1]

#### a. Member of a Protected Class

As a female, Brainerd is a member of a protected class. *See Estes v. Vilsack*, 2013 U.S. Dist. LEXIS 132836, *31 (D. Colo. Sept. 17, 2013) ("First, it is undisputed that, as a female, plaintiff is a member of a protected class").

#### b. Qualified For and Satisfactorily Performing Her Job

The parties present no argument as to whether Brainerd was qualified to obtain her job. However, Brainerd and Schlumberger dispute whether Brainerd was satisfactorily performing her job at the time of her termination.

As a preliminary matter, it is necessary to briefly describe the Commerce City Facility's composition as it is relevant in analyzing and understanding the parties' arguments. The facility is comprised of several departments, one of which is the Push Pull Department. The Push Pull Department disassembles and cleans used equipment, then reassembles the equipment, tests it, and sends the equipment back to the field for use. The Push Pull Department is sub-divided into separate "cells," one of which is the Power Drive Cell. The Power Drive Cell is further sub-divided into three units: (1)

---

[1] In *Barlow*, the United States Court of Appeals for the Tenth Circuit stated that "[a] plaintiff's articulation of his *prima facie* case may vary depending on the nature of the claim." However, the Tenth Circuit went on to say to "[m]ost generally, a plaintiff must demonstrate . . . " the three above-listed elements to establish a viable Title VII discrimination claim. Though *Barlow* address race discrimination, the elemental framework is equally applicable here.

disassembly; (2) subassembly; and, (3) buildup.  Brainerd spent the majority of her time in the disassembly sub-unit, with a short stint in the subassembly unit.

### i. Brainerd

On Tuesday, September 6, 2011, Andrew Emerson, Push Pull Supervisor, emailed Kevin Ramsay, Maintenance Manager, and Edward Tilschner, Field Training Champion, that Brainerd "will not be able to progress in push/pull" *i.e.*, she would be terminated. ECF No. 36-4, p. 1.  Brainerd states that prior to this email, there is no evidence in writing that her performance was deficient and that "she was repeatedly told by her supervisors that her performance was fine." ECF No. 36, p. 16, ¶ 3.  In her Attestation [ECF No. 36-1], Brainerd states that she was never given a written, negative evaluation by any Schlumberger employee and was never told that she was behind in training or lacked a core competency. ECF No. 36-1, pp. 1-2, ¶ 3.  Brainerd further states that the only written evaluations she received were on-the-job training ("OTJ") log sheets. *Id.* at p. 4, ¶ 13.  Brainerd states that her mentor who filled out her OTJ log sheets, Chris Reno, never put a negative comment in any OTJ log.[2] *Id.*  Reno testified in his deposition that he never documented any deficiencies in Brainerd's OTJ log sheets and if he indeed were to document a deficiency, he would have included the deficiency in the OTJ log sheets. ECF No. 36-2, p. 2 [p. 17, ll. 24-25 / p. 18, ll. 1-5]. Reno further testified that he believed Brainerd could progress in the Push Pull Department and that there was nothing impeding her progress. *Id.* at p. 4 [p. 42, ll. 3-10].

---

[2] Brainerd did not tender any OTJs in support of her argument.  Further, upon close inspection of the parties' depositions, there is a discrepancy as to whether Brainerd filled out the OTJs and Reno reviewed them with Brainerd, or whether Reno filled out the OTJs and reviewed them with Brainerd.  Either way, this discrepancy is not material in ruling on this motion.

### ii. Schlumberger

Though Brainerd states that there was no evidence in writing prior to Emerson's email that her performance was unsatisfactory, Emerson testified in his deposition that "deficiencies in a trainee's performance" are normally not memorialized in written form. ECF No. 32-5, p. 8, ll. 23-25. While a manager certainly has discretion to do so, it is not the norm. Regarding Brainerd's statement that her supervisors repeatedly told her that she was performing satisfactorily, there is scant evidence, if any, to support that assertion. In fact, the evidence before me points to the contrary.

Bryan Peterson, lead technician of the Power Drive Cell, testified in his deposition that he received complaints from numerous employees regarding Brainerd. Specifically, he testified that "she wasn't able to be trained easily. She didn't show the willingness to perform the tasks that she was assigned and continued to try and skip ahead of the training that we were comfortable with her at the time." ECF No. 32-7, p. 10, ll.13-17. While Reno, Brainerd's mentor, testified that he thought Brainerd could "progress" in the Push Pull Department and that nothing was impeding her progress, he offered testimony that directly conflicts with such statements. Reno also testified that: (1) he did not remember whether Brainerd ever moved on to other areas in the Power Drive Cell[3]; (2) he was aware that Brainerd's performance had been characterized as "not being acceptable;" and, (3) he told Emerson that Brainerd "seemed to accel in the early months and then tended to or seemed to decel [sic] further on." ECF No. 36-2, p. 3 [p. 25, ll. 13-14 / p. 26, ll. 22-25 / p. 28, ll. 9-14].

---

[3] According to the parties' depositions, the normal progression of a new employee in the Power Drive Cell, such as Brainerd, would be to spend a certain amount of time in one Power Drive Cell unit, gain competency in that unit, then move on to a different Power Drive Cell unit. The inability to gain competency in one unit would either slow or prevent an employee's progression to a subsequent Power Drive Cell unit.

In his Declaration [ECF No. 32-2], Emerson declared that he reviewed Brainerd's performance at the end of May 2011.  He specifically stated that "[b]ased on my review of Plaintiff's training, Plaintiff did not have the necessary understanding of the tools or the process to progress to the next training stage.  Accordingly, I assigned Plaintiff an *additional week* of disassembly training." ECF No. 32-2, p. 3, ¶ 19 (emphasis added). Emerson further stated that he "frequently observed Plaintiff sitting down on the job in inappropriate areas of the shop" and that he found Brainerd "laying down on the floor in the outgoing systems test bay ('OST bay'), a dangerous area of the shop." *Id.* at ¶ 22 / p. 4, ¶ 23.

Due to concerns about Brainerd's performance, Paul Dickson, who was Maintenance Manager at the time of the relevant events (Ramsay later took over as Maintenance Manager when Dickson was promoted to North America Land Maintenance Manager), testified in his deposition that he convened a formal disciplinary meeting on July 7, 2011, with Brainerd, Emerson, and another supervisor.  Emerson testified in his deposition that this was not a "normal" meeting and it was convened to address specific issues with Brainerd's performance and work behavior. ECF No. 32-5, p. 35, ll. 10-14.  Dickson stated that he discussed the following issues during the meeting:  (1) Brainerd's lack of focus; (2) texting while being taught how to perform tasks during a training session; (3) Brainerd's lack of professionalism and an immature attitude; (4) "outburst[s] at various trainers, co-workers and her cell-lead over their direction and how to perform tasks;" and, (5) "a very vocal stance on her unwillingness to perform overtime . . . " ECF No. 32-4, p. 3, ¶ 18.

Brainerd's performance did not improve after the formal disciplinary meeting. Despite the fact that Emerson assigned Brainerd an additional week of training in the disassembly unit and she still failed to obtain competency in that unit, Emerson allowed Brainerd to progress to the subassembly unit with hopes that this progression would help her performance. However, these hopes were not realized. On July 28, 2011, Emerson reviewed Brainerd's training progression and concluded that Brainerd "lacked core competencies related to on-the-job training records and safety that should have been concretely established in her *first* rotation in disassembly." ECF No. 32-2, p. 5, ¶ 32 (emphasis added). As such, Emerson reassigned Brainerd *back* to the disassembly unit "to reinforce the basics of [Brainerd's] job." *Id.* at ¶ 33. Thus, this was Brainerd's third stint in the disassembly unit.

During Brainerd's reassignment back to the disassembly unit, Emerson and Ramsay witnessed Brainerd improperly and unsafely remove parts from a "bias unit" twice. First, Brainerd allowed a clamp plate, which weighs in excess of 25 pounds, to drop onto an unsecured cart. Both Emerson and Ramsay "considered dropping a clamp plate a serious safety concern because it created an unnecessary risk that the clamp plate may bounce off the cart and injure a near co-worker." ECF No. 32-2, p. 5, ¶ 36 / ECF No. 32-1, p. 2, ll. 14. They both further state that the purpose of disassembling a bias unit is to clean it and re-use its parts. Thus, Brainerd's improper disassembly could have caused the clamp plate to break and become useless. Second, approximately five minutes after Brainerd let the clamp plate drop onto an unsecured cart, Brainerd failed to properly strap down the bias unit. This failure creates a risk that "the tool could flex during removal, rip away from the bench, and slingshot

into the shop area . . . " ECF No. 32-2, p. 6, ¶ 40.  Both Emerson and Ramsay considered this sub-standard performance and concluded that despite extended training in disassembly, Brainerd lacked the ability to properly perform her job.  Brainerd maintains that she performed the maneuver in the way she was trained.

Under *McDonnell Douglas*, Brainerd bears the burden of establishing that she was satisfactorily performing her job at the time of her termination and she has failed to do so.  The evidence before me is sufficient for me to find that Brainerd was not performing her job satisfactorily at the time of her termination.  Because Brainerd has not established this element of her *prima facie* case, my analysis stops here, Brainerd's sex discrimination claim fails, and Schlumberger is entitled to judgment as a matter of law.

## CONCLUSION

After careful consideration of the matter before this Court, it is

ORDERED that Schlumberger's Motion For Summary Judgment [ECF No. 32] is **GRANTED** and Brainerd's Title VII sex discrimination claim is **DISMISSED WITH PREJUDICE**.  As such, it is

FURTHER ORDERED that the Trial Preparation Conference set for Wednesday, May 28, 2014, at 10:00 a.m. in Courtroom A-1002 is **VACATED**.  It is

FURTHER ORDERED that the four-day jury trial set to commence on Monday, June 16, 2014, at 8:30 a.m. in Courtroom A-1002 is **VACATED**.

Dated:  March 25, 2014.

- 11 -

BY THE COURT:

/s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior U. S. District Judge